IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
SENIOR JUDGE MARCIA S. KRIEGER

Civil Action No. 18-cv-01851-MSK-KMT

**FREDRICK D. ROBINSON,**

    Plaintiff,

v.

**NICOLE STUMPH,**

    Defendant.

___

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**
___

**THIS MATTER** comes before the Court pursuant to Defendant Nicole Stumph's Motion for Summary Judgment **(# 70)**, Mr. Robinson's response **(# 80)**, and Ms. Stumph's reply **(# 81)**. Also pending is a motion by Ms. Stumph to restrict public access **(# 71)** to one of the exhibits supporting her summary judgment motion.

## FACTS

The Court summarizes the pertinent facts here and elaborates as necessary in its analysis.

At all relevant times, Mr. Robinson was an inmate in the custody of the Colorado Department of Corrections ("CDOC"), housed at the Sterling Correctional Facility ("Sterling"). On the morning of July 29, 2016, Mr. Robinson awoke in his cell in "excruciating pain, [with] a numbness and tingling sensation in my face and left arm and lack of mobility in both legs." With the assistance of a fellow inmate, Mr. Braddock, Mr. Robinson borrowed a wheelchair and Mr. Braddock wheeled him to the Sterling facility's medical clinic.

Mr. Braddock described Mr. Robinson's symptoms to an unidentified nurse at the reception area and that nurse told them to wait in the waiting area. They waited for 90 minutes, at which time Mr. Braddock approached Nurse Stumph and explained Mr. Robinson's symptoms. Nurse Stumph told Mr. Braddock to have Mr. Robinson continue wait. However, Mr. Robinson decided to not wait any longer and had Mr. Braddock wheel him back to his living area. Nurse Stumph's notes from this encounter state "Offender left medical while nurse was seeing other offender. Wasn't willing to wait to be seen."

The following morning, July 30, 2016, Mr. Robinson awoke with the same symptoms. He again had Mr. Braddock wheel him to the medical clinic. There is a dispute of fact at this point: Mr. Robinson states that he was seen by Nurse Stumph at this time, but Nurse Stumph points to medical records that indicate that Mr. Robinson was instead seen by Nurse Dillinger. Whoever treated Mr. Robinson recorded notes from this encounter that appear to be incomplete, stating that Mr. Robinson appeared "for self-declared emergency for dizziness, states that it has been for one day, states that he [ ]" with the sentence ending incomplete. The treating nurse took Mr. Robinson's blood pressure (which was significantly elevated), temperature, and pulse. The notes do not disclose any other testing, impressions, or diagnosis from the treating provider, but they record that Mr. Robinson was prescribed Zyrtec, an allergy medication, to take for 14 days and that he was to "report to medical, use of meds, [blood pressure] check 3 this week, results to [Primary Care Physician]."

Describing this encounter in his deposition, Mr. Robinson testified that Nurse Stumph "told me then that perhaps I was recovering from an ear infection and that maybe . . . I should go to the med line and get some kind of medication." He seems to concur in the understanding that "it was an allergy medication" that was prescribed. He also asked her for a prescription for a

2

wheelchair, but "she said that she wouldn't be able to give me one." He then returned to his living unit.

Records indicate that Mr. Robinson was seen in the medical clinic again on August 2, 2016, by Nurse Tennant, "for recheck of ear pain." Notes from this visit indicate that Mr. Robinson was "in no acute distress" at the time and that the only symptoms he reported were "dry cough [that] worsens when laying down" and occasional discharges of mucus when coughing. It appears to be undisputed that Nurse Stumph was not involved with this visit.

On the evening of August 5, 2016, Mr. Robinson became disoriented and confused, lost his voice, and experienced numbness in his face. The following morning, August 6, he reported to the medical clinic. Notes from this visit indicate that he was seen by Nurse Kearns, although Mr. Robinson insists that he was seen by two nurses in this encounter, the second being Nurse Stumph. Records reflect that someone took Mr. Robinson's blood pressure and, finding it elevated again, "educated [him] on sodium [and] reading [nutrition] labels" on packaged foods. He was counseled on daily sodium intake, encouraged to avoid adding salt to meals and instead use other flavorings, to exercise and make "lifestyle changes." The notes also indicate that the medical staffer "touch[ed] on CVA [cerebrovascular accidents], stroke, MI [myocardial infarction]," which the Court understands to mean that the nurse discussed those conditions, their causes, and perhaps their symptoms with Mr. Robinson.

Mr. Robinson's recollection of this event is significantly different. His affidavit states that he was initially seen by Nurse Tennant, who asked "why I was being treated for a problem with my ears," to which Mr. Robinson responded that "I had not complained about problems with my ears." He states that, thereafter, he was seen by Nurse Stumph, to whom he "repeated my ongoing symptoms." He states that Nurse Stumph "administered an EKG and examined my

3

legs, finding I had limited range of mobility in both legs." He again requested that she prescribe a wheelchair, but "she denied my request."

Mr. Robinson returned to the medical clinic on August 12, 2016 "for [an] ear check." He was seen by Nurse Stumph, who noted that his gait was "steady" and his respiration even and unlabored. She noted no signs of an ongoing ear infection.

On August 13, 2016, Mr. Robinson again reported to the medical clinic. According to the medical notes, he had reported an emergency due to "dizziness and dry heaving." He was seen by Nurse Stumph, who noted that his gait was steady and respiration even. Mr. Robinson reported that "he is not nauseated at all but has some facial numbness and [left upper extremity] numbness. Nurse Stumph examined his upper and lower extremities, his tongue, and his smile, finding all of them to be symmetrical. His lungs were noted as clear, his heart rate regular, and bowel sounds were active. Nurse Stumph noted "ear canal redness and swelling noted," but was unable to examine his eardrum due to "impacted cerum [earwax]." She indicated that Mr. Robinson would be referred for a follow-up nurse evaluation. Mr. Robinson's affidavit does not address this visit and the Court assumes he concedes the accuracy of these facts.

On August 14, 2016, Mr. Robinson again presented at the medical clinic, and apparently was seen by Nurse Dillinger. Staff had reported that he "is slurring words" and Mr. Robinson himself reported "head pain since yesterday and numbness to left side of face from ear to lip," as well as numbness in his left arm, dizziness, and difficulty walking. The nurse attending to him observed that his speech was appropriate and "no noted slurring at this time." The nurse performed "cranial nerve [ ] testing" that "reveals no deficit." The nurse administered an EKG and related the results to Mr. Robinson's primary care provider. The on-call medical provider instructed that Mr. Robinson be administered Catapres, a medication used to treat high blood

4

pressure, as Mr. Robinson's blood pressure was elevated. After 30 minutes, Mr. Robinson "stated he noticed some difference" and his blood pressure had diminished slightly. At that time, the nurse approved him to return to his cell, with a need to recheck his blood pressure the following day and potentially consult with the facility's doctor.

In his affidavit, Mr. Robinson describes this visit as occurring "because I began to suffer the same debilitating symptoms I complained of during each of my previous visits." He states that Nurse Stumph "was present for that appointment and treated me," but that she "treated me as though I was malingering and lying about my condition." He states that she "dismissed me without an evaluation and returned me to my living unit."

Early the following morning, August 15, 2016, Mr. Robinson suffered a major stroke while in his cell. He was found by unresponsive by CDOC staff on the floor of his cell, transported initially to the medical clinic, and then taken by ambulance to a local hospital.

Mr. Robinson commenced this action[1] under 42 U.S.C. § 1983, alleging that Nurse Stumph was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the U.S. Constitution. Nurse Stumph moves **(# 70)** for summary judgment on the claim against her, arguing that Mr. Robinson cannot show that she was subjectively indifferent to his condition on those occasions when she treated him.

---

[1] Mr. Robinson initially proceeded *pro se*, but has been represented by counsel since the filing of an Amended Complaint **(# 15)** and throughout the briefing of Nurse Stumph's motion. As a result, the Court disregards that portion of Mr. Robinson's summary judgment response that purports to establish facts by citing to allegations made in Mr. Robinson's unverified Amended Complaint. Mr. Robinson separately tendered an affidavit in conjunction with his summary judgment response and the Court considers it.

## ANALYSIS

### A. Summary judgment standard

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material

fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B. Mr. Robinson's claim

The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual punishment." In the context of prison medical care, that amendment has been interpreted to prohibit prison medical staff from wantonly inflicting pain on an inmate by deliberately ignoring the inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). To establish an Eighth Amendment claim, Mr. Robinson must show: (i) that he had an objectively serious medical need, that is, one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for medical attention; and (ii) that a prison official subjectively knew of that medical need yet disregarded the risk of harm to the inmate's health or safety. *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). To satisfy the second element, the inmate must show that the official was subjectively aware of a substantial risk that the inmate could suffer serious harm if untreated. *See e.g. Reneau v. Cardinas*, 852 Fed.Appx. 311, 314 (10th Cir. 2021). The mere fact that a medical provider was negligent in diagnosing or treating a medical condition does not amount to an Eighth Amendment violation. *Ortiz v. Torgenson*, __ Fed.Appx. ___, 2021 WL 1327795

(10th Cir. Apr. 9, 2021). Rather, an inmate must show "an extraordinary degree of neglect" when challenging a provider's exercise of medical judgment. *Id.*

There is clearly a sharp factual dispute between the parties on several points: the number of times and dates on which Mr. Robinson was seen in the medical clinic, who provided treatment to him at that time, and what that treatment was. Nurse Stumpf argues that the Court could disregard Mr. Robinson's allegations – at least those from the August 14 treatment – under the "sham affidavit" doctrine. That doctrine provides that, once a party has responded to discovery, the party may not thereafter contradict those discovery responses with a subsequent affidavit in order to create a "sham fact issue" sufficient to avoid summary judgment. *See Franks v. Nimmo*, 796 F.3d 1230, 1237 (10th Cir. 1986). The Court need not reach that issue, however, because the matter can be resolved based on the statements in Mr. Robinson's own affidavit, as supplemented by that portion of medical records that are not otherwise inconsistent.

According to Mr. Robinson's affidavit, he had four encounters with Nurse Stumph. The first occurred on July 29, 2016, when he went to the medical clinic, waited 90 minutes, was told by Nurse Stumph to wait some more, and instead left without receiving treatment. The Court cannot conclude that Nurse Stumph's instruction to Mr. Robinson to continue waiting constitutes deliberate indifference to his medical needs; to the contrary, it was an instruction for him to wait his turn to be treated. Although Mr. Robinson might feel that 90 minutes is a long time to wait for medical treatment, especially in circumstances where he was concerned about his own health, common experience makes clear that such waits are not unusual in busy emergency rooms. Thus, the events of July 29, 2016, alone, cannot support an Eighth Amendment claim.

Next, Mr. Robinson states that he was seen by Nurse Stumph the following day, July 30, when he complained of numbness and tingling in his face and arms and the loss of mobility in

8

his legs, but Nurse Stumph (who we will assume attended to Mr. Robinson) recorded his primary symptom as "dizziness."  It is not clear whether there was a miscommunication between the parties about Mr. Robinson's complaints, whether Nurse Stumph failed to fully record in her notes the symptoms Mr. Robinson presented, whether she prioritized symptoms of dizziness over Mr. Robinson's other symptoms, or whether she simply overlooked his other symptoms.  But the record is undisputed that Nurse Stumph diagnosed Mr. Robinson as having a condition – possibly an ear infection[2] -- that would benefit from a prescription allergy medication, prescribed that medication, and requested further follow-ups to also address his elevated blood pressure.

In retrospect, it may be that Nurse Stumph overlooked the signs of an incipient stroke, and she may have even been negligent in doing so.  But as noted above, negligent treatment does not arise to an Eighth Amendment violation.  *Oritz*, *supra.*  Because Nurse Stumph attempted to treat what she subjectively believed was ailing Mr. Robinson on July 30, Mr. Robinson's Eighth Amendment claim relating to that visit is also without any colorable merit.  Similarly, although Mr. Robinson might have felt that being prescribed a wheelchair was appropriate, it is clear that Nurse Stumph considered his request for one but decided it was not warranted.  Once again, the mere fact that Mr. Robinson disagrees with Nurse Stumph's exercise of medical judgment regarding his need for a wheelchair does not amount to an Eighth Amendment violation.  *Id.*

According to Mr. Robinson, his next interaction with Nurse Stumph was on August 6, 2016.  Mr. Robinson asserts that he was seen first by a different nurse, and then later by Nurse Stumph.[3]  He explained his ongoing symptoms – presumably the same tingling, pain, and

---

[2] It is clear to the Court that Mr. Robinson conflated aspects of his July 30 visit with details from his August 2 visit specifically for "recheck of ear pain."  But that obvious confusion does not alter the analysis herein.

[3] The fact that Mr. Robinson was admittedly seen by two nurses during this visit further militates against a finding of deliberate indifference by Nurse Stumph.  To the extent that Mr.

weakness he previously had experienced – An EKG test was performed and his legs were examined. The fact that Nurse Stumph engaged in diagnostic testing and a physical exam of Mr. Robinson suffices to defeat his claim that she was deliberately indifferent to his medical needs during this visit. *Ortiz, supra.* ("Burnham and Dennis treated Ortiz every time he asked, and they always prescribed some sort of medicine, diagnostic test, therapy, or other treatment"). Once again, Mr. Robinson may disagree with Nurse Stumph's conclusion that his condition did not warrant a prescription for a wheelchair, but that disagreement does not arise to a constitutional claim.

Mr. Robinson's final claimed encounter with Nurse Stumph was on August 14, apparently for complaints of slurred speech, dizziness, facial and arm numbness and tingling, and dizziness. Mr. Robinson's affidavit on this point is somewhat cautiously worded: he states that "Nurse Stumph was present for that appointment and treated me" and that she "dismissed me without an evaluation," but he does not assert that Nurse Stumph was the only medical provider present during that appointment.[4] In this regard, Mr. Robinson's version of events is consistent with his medical records, which indicate that Nurse Dillinger was also present at that appointment. Those records reflect that Nurse Dillinger conducted a thorough physical examination of Mr. Robinson, including cranial nerve testing. Nurse Dillinger also performed an EKG test, administered medication, and eventually, after a period of observation, released him to

---

Robinson is contending that his symptoms visibly evidenced a need for immediate medical treatment, it would appear that the other nurse who examined him and discussed his ongoing ear treatment with him did not observe, much less record and treat, those symptoms either.

[4]   In his deposition testimony about this visit, Mr. Robinson states that "[Nurse] Tennant sent me back and told me to relax." It is not clear whether he has confused Nurse Tennant with Nurse Stumph, with Nurse Dillinger, or whether he might have been seen by a third nurse during this encounter. In any event, he has not asserted that Nurse Stumph was the only provider treating him that day.

return to his living unit. The fact that Nurse Stumph allegedly "dismissed" Mr. Robinson "without an evaluation" on August 14 is not evidence of deliberate indifference, given that Mr. Robinson was examined and treated by Nurse Dillinger. In such circumstance, any "dismissal" by Nurse Stumph posed no risk of serious harm because her co-worker examined and treated him. Thus, Mr. Robinson's allegations regarding Nurse Stumph's actions on August 14 do not suffice to create a colorable Eighth Amendment claim.

Taking the pertinent statements in Mr. Robinson's affidavit as true, he has not shown that Nurse Stumph knew of a serious medical need that Mr. Robinson had, but disregarded the risk of harm to his health or safety. Accordingly, Nurse Stumph is entitled to summary judgment on Mr. Robinson's claim.

### C. Motion to restrict access

Nurse Stumph moves **(# 71)** to restrict public access to Mr. Robinson's medical records under D.C. Colo. L. Civ. R. 7.2. Those records are central to the Court's analysis herein, and thus, the public has a considerable interest in having access to those records in order to assess the reasonableness of the Court's reasoning. At the same time, Mr. Robinson has a considerable privacy interest in avoiding the undue public disclosure of his medical records, particularly those that do not relate directly to the events at issue here but which are nevertheless included in Docket #72.

The Court has attempted to balance those interests by quoting extensively from the pertinent medical records as part of this Opinion allowing maximum public understanding of the records pertinent to the Court's analysis, while still allowing the exhibit as a whole to remain under restricted access. Accordingly, the Court grants the motion and Docket #72 will remain under a Level 1 restriction.

## **CONCLUSION**

For the foregoing reasons, Nurse Stumph's Motion for Summary Judgment **(# 70)** is **GRANTED**. The Clerk of the Court shall enter judgment in favor of Nurse Stumph on Mr. Robinson's claim. There being no remaining claims or defendants, the Clerk of the Court shall thereafter close this case. Ms. Stumph's Motion to Restrict **(# 71)** is **GRANTED**, and Docket #72 shall remain under a Level 1 restriction.

Dated this 19th day of August, 2021.

**BY THE COURT:**

Marcia S. Krieger
Senior United States District Judge